**EXHIBIT "1"**

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "Agreement") is entered into as of this 9th day of February, 2010 (the "Effective Date"), by and between RE/MAX Marquee Partners, Inc., a California corporation ("Seller") and Surfside Ventures, Inc., a California corporation ("Purchaser") (referred to hereinafter individually as a "Party" and collectively the "Parties") with reference to the following:

## RECITALS

WHEREAS, Seller leases certain real property commonly known as: (1) the MARINA DEL REY/VENICE OFFICE located at 155 Washington Blvd., Marina Del Rey/Venice, CA 90292, and (2) the SANTA MONICA OFFICE located at 501 Santa Monica Blvd., 2nd Floor, Santa Monica, CA 90401 (collectively the "Premises"), wherein Seller operates a business office at each Premises serving as a real estate brokerage business collectively known with other office locations as RE/MAX Marquee Partners, Inc. dba RE/MAX Beach Cities Realty, dba RE/MAX Westside Properties, dba RE/MAX Beverly Hills (hereinafter known as the "Company"); and

WHEREAS, Seller desires to sell to Purchaser and Purchaser desires to purchase from Seller certain enumerated assets of Seller related to the Company, as more fully described herein, upon and subject to the terms and conditions hereinafter set forth;

WHEREAS, Seller intends to file a voluntary Chapter 11 bankruptcy petition (the "Bankruptcy Petition"), in the United States Bankruptcy Court for the Central District of California ("Bankruptcy Court") and to diligently pursue obtaining a final order therefrom approving the conveyance contemplated by this Agreement.

NOW THEREFORE, in consideration of the promises, representations, warranties, covenants and agreements contained herein and other good, valuable and sufficient consideration, the receipt of which is hereby mutually admitted, Seller and Purchaser, intending to be legally bound, hereby covenant and agree as follows:

## AGREEMENT

## Article 1 - PURCHASE AND SALE OF ASSETS

1.1     <u>Transfer of Assets</u>. Subject to the terms and conditions set forth herein, including but not limited to the approval of this Agreement by the Bankruptcy Court, at the Closing (as defined herein), Seller shall sell, assign, transfer and convey to Purchaser, and Purchaser shall purchase and accept from Seller, all of Seller's right, title and interest in and to certain of the tangible and intangible assets of the Company, an exhaustive list of which is provided on Exhibit "A" (collectively the "Purchased Assets"), which is attached hereto and incorporated herein by reference, with such changes therein, additions thereto and deletions therefrom as may occur from the date hereof through the Closing Date (as defined herein) in the ordinary course of business or as may be permitted or required pursuant to the terms hereof.

1.2     <u>Excluded Assets</u>. Only those enumerated tangible and intangible assets which are expressly set forth in Exhibit "A" are to be sold, assigned, transferred and conveyed to Purchaser hereunder, directly or indirectly, and all other assets, rights, interests, rights of claims and properties of Seller not expressly set forth on Exhibit "A" shall be specifically excluded from the transactions contemplated by this Agreement.

1.3     <u>Accounts Receivable Purchase Option</u>. Seller hereby grants to Purchaser an option to purchase any or all of the accounts receivable of the Company and/or any individual agent of Company. Purchaser may exercise this option, in Purchaser's sole discretion, by written notice delivered to Seller at

Re/Max PV-Re/Max Marquee
Purch Sale Agmt 2-9-10

least ten (10) days prior to the first scheduled hearing in the Bankruptcy Court to approve this Agreement ("Approval Hearing"). Exercise of this option and purchase of said accounts receivable shall be deemed in exchange for good and valuable consideration, in an amount to be determined and agreed upon by the Seller and the Purchaser prior to ten (10) days prior to the Approval Hearing. Any accounts receivable elected to be purchased in accordance herewith shall be included in the Purchased Assets list attached hereto as Exhibit "A."

      1.4    Purchase Price. In consideration of the sale, assignment, transfer and conveyance of the right to the Premises and the Purchased Assets to Purchaser by Seller in accordance with and upon the terms and conditions set forth in this Agreement, Purchaser shall pay to Seller a purchase price of Fifty Six Thousand Seven Hundred and No/100 Dollars ($56,700) (the "Purchase Price").    Seller acknowledges that Purchaser has paid Seller Three Thousand Three Hundred Thirty Three and 33/100 Dollars ($3,333.33) in connection with Purchaser's due diligence conducted prior to execution of this Agreement ("Due Diligence Fee").  Seller agrees that the Due Diligence Fee shall be applied against the Purchase Price at Closing; provided, however, that in the event the Closing shall not occur, Seller shall have no obligation to return the Due Diligence Fee.  Purchaser acknowledges that the Purchase Price is subject to overbid by other prospective purchasers and approval by the Bankruptcy Court.  In the event that Purchaser is not the successful purchaser of the Purchased Assets and another entity purchases the Purchased Assets pursuant to a Sale Order, then subject to any necessary approval of the Bankruptcy Court, the entirety of the Deposit shall promptly be returned to Purchaser.  In addition, ,the Purchaser shall be paid a break up fee in an amount of not less than Six Thousand Six Hundred Sixty Six and 67/100 Dollars ($6,666.67) (the "Break Up Fee") upon the closing of the transaction to the approved over-bidder.

      1.5    Payment. The Purchase Price shall be payable in full in good and sufficient funds at the Closing (as defined hereinafter).

      1.5.1    **Purchase Price Allocation**: The Purchase Price, subject to any adjustment as hereinafter provided, shall be allocated to the various assets of the Company as determined in the sole discretion of Purchaser, unless such allocation shall create any material adverse tax consequences to the Seller or its bankruptcy estate.

      1.5.2    **Prorations**: The following items, if any, shall be prorated to the day of Closing: all applicable taxes, utilities, insurance, leases, rents or other contract rights.

      1.6    Deposit. Within one (1) business day following full execution of this Agreement but no later than the day prior to Seller's announcement to the Company's agents of the transaction contemplated herein, Purchaser shall deposit with Peninsula Escrow, Inc. ("Escrow Agent"), having its office at 734 Silver Spur Road #104, Rolling Hills Estates, CA 90274, the sum of Eleven Thousand Three Hundred Forty and No/100 Dollars ($11,340)  (the "Deposit") in good funds, either by certified bank or cashier's check or by federal wire transfer. Seller hereby acknowledges that Escrow Agent is an affiliate of Purchaser and that some or all of Purchaser's officers, directors and/or shareholders are also officers, directors or shareholders of Escrow Agent.  The Deposit is hereby agreed between the parties not to be deemed the property of Seller unless and until Closing, except in the event of Purchaser default under this Agreement, in which case the Deposit shall be forfeited to Seller in accordance herewith.  Escrow Agent shall hold the Deposit in an interest-bearing account reasonably approved by Purchaser.  All interest on such sum shall be deemed income of Purchaser and Purchaser shall be responsible for the payment of all costs and fees imposed on the Deposit account.  Unless Purchaser elects to cancel this Agreement pursuant to the express terms contained herein, Escrow Agent shall release the Deposit (by application to the Purchase Price) to Seller at Closing and the Deposit shall become the property of Seller and shall not be refunded to Purchaser under any circumstances, except due to the default of Seller or as expressly provided herein this Agreement.  The Deposit and all interest accrued thereon shall be applied against the Purchase Price at Closing.

Re/Max PV-Re/Max Marquee
Purch Sale Agmt 2-9-10

1.7    Escrow Agent. Escrow Agent shall hold and dispose of the Deposit in accordance with the terms of this Agreement. Seller and Purchaser agree that the duties of Escrow Agent hereunder are purely ministerial in nature and shall be expressly limited to the safekeeping and disposition of the Deposit in accordance with this Agreement. Escrow Agent shall incur no liability in connection with the safekeeping or disposition of the Deposit for any reason other than Escrow Agent's willful misconduct or negligence. In the event Escrow Agent shall be in doubt as to its duties or obligations with regard to the Deposit, or in the event that Escrow Agent receives conflicting instructions from Purchaser and Seller with respect to the Deposit, Escrow Agent shall not disburse the Deposit and shall, at its option, continue to hold the Deposit until both Purchaser and Seller agree as to its disposition or until a final judgment is entered by a court of competent jurisdiction directing its disposition, or Escrow Agent may interplead the Deposit in accordance with the laws of the State of California. Escrow Agent shall execute this Agreement solely for the purposes of being bound by Sections 1.4 through 1.7 hereof.

## Article 2 – FEASIBILITY

2.1    Delivery of Documents. Seller shall deliver to Purchaser such information as reasonably requested by Purchaser in connection with review of the Premises and Purchased Assets within one (1) business day of receipt by Seller of such request, or as soon as practicable thereafter. Such material information shall include, but is not limited to, financial statements, copies of equipment leases, copies of any service contracts affecting the Premises or Purchased Assets, and copies of any independent contractor contracts attendant with the on-going business of the Company. Purchaser acknowledges that Seller has provided Purchaser with all documents and things requested as of the date of execution of this Agreement in connection with conducting Purchaser's due diligence investigation of the Purchased Assets.

2.2    Inspection of Property. Purchaser has conducted an independent investigation and inspection of the Property, utilizing such experts as Purchaser deems necessary. Purchaser acknowledges that (a) it has been given complete and free access to all books and records of Seller relating to the Property and copies of any contracts or other documents associated with the Purchased Assets, other than any of the same which are subject to the attorney-client privilege or confidentiality agreements with third parties, and (b) it has also been afforded sufficient time and the opportunity to conduct any and all inspections, investigations, interviews of management, financial and operating personnel, audits and analyses with respect to the Purchased Assets. Purchaser shall complete its due diligence investigation within 7 calendar days of execution of this Agreement, but in no event later than February 9, 2010.

2.3    Right of Termination. Purchaser shall have the right to terminate this Agreement at anytime prior to Closing  (A) if Seller has made any fraudulent misrepresentations to Purchaser of a material fact; and/or (B) upon the occurrence of any of the conditions precedent set forth in Section 3.6 below. In the event either of the foregoing occur, Purchaser may provide written notice thereof to Seller and Escrow Agent of its intent to terminate.  If this Agreement is properly terminated pursuant to the foregoing provisions of this Section, or as otherwise expressly provided herein this Agreement, then neither party hereto shall have any further rights or obligations hereunder (except for any indemnity obligations of either party hereto pursuant to the other provisions of, or as specifically otherwise provided in, this Agreement), the Deposit (and in the case of a fraudulent misrepresentation by Seller, the Due Diligence Fee) shall be returned to Purchaser and each party shall bear its own costs incurred hereunder. Upon such termination, Purchaser agrees to promptly return to Seller all materials provided to Purchaser by Seller and shall hold all such information in strict confidence.

2.4    Seller Obligations in Bankruptcy Proceeding. Seller hereby covenants and agrees that it shall file the Bankruptcy Petition with the Bankruptcy Court. Seller further hereby covenants and agrees that it shall file a duly noticed motion with the Bankruptcy Court requesting approval of this Agreement within fifteen (15) calendar days from filing of the Bankruptcy Petition. Purchaser recognizes that the terms of the conveyance contemplated by this Agreement are subject to overbid, with any such overbids

Re/Max PV-Re/Max Marquee
Purch Sale Agmt 2-9-10

to be considered by the Bankruptcy Court at the hearing (the "Sale Hearing") on the motion for sale (the "Sale Motion"), with Purchaser having the right, but not the obligation, to participate in any bidding that occurs for the Purchased Assets. At the Sale Hearing, the Bankruptcy Court shall decide which of the bids is the highest and best bid, and such bid shall be the "High Bid." Notwithstanding anything herein, Purchaser acknowledges that if Seller cannot obtain the consent of Seller's secured lender to the sale, then Seller will be selling the Purchased Assets through a plan of reorganization.

## Article 3 - CLOSING

3.1     Closing.  The consummation of the transactions contemplated hereby (the "Closing") shall take place at such place at the offices of Creim, Macias, Koenig & Frey, LLP not earlier than the eleventh (11th) day and not later than the twenty-first (21st) day after the date of entry of a Final Order (as defined below) by the Bankruptcy Court approving this Agreement and sale to Purchaser of the Purchased Assets either through a sale pursuant to 11 U.S.C. Section 363 of the United States Bankruptcy Code or through a plan of reorganization ("Sale Order"), said date being referred to herein as the "Closing Date." A "Final Order  " means entry of an order of the Bankruptcy Court, the operation or effect of which has not been reversed, stayed, modified or amended, and as to which order (or any revision, modification or amendment thereof), the time to appeal or seek review or rehearing has expired and as to which no appeal or petition for review or rehearing has been taken or is pending. A Final Order shall also consist of an order as to which an appeal, notice of appeal, motion to amend or make additional findings of fact, motion to alter or amend judgment, motion for rehearing or motion for new trial has been filed, or the time to do any of the foregoing has not yet expired, but as to which the Seller and Buyer, in their sole and absolute discretion, elect to proceed with closing. The substance and form of the Final Order approving the sale is subject to Purchaser's reasonable approval.

3.2     Liabilities.  Seller agrees that Purchaser assumes no liabilities of Seller or Company, unless otherwise expressly provided for herein. Purchaser shall receive possession and control of the Purchased Assets and all other rights acquired herein, pursuant to a bankruptcy court order, free and clear of any encumbrances, unless otherwise expressly provided for herein.

3.3     Closing Obligations and Deliveries of Seller. At the Closing, Seller shall deliver, or cause to be delivered, to Purchaser:

(a)     A duly executed bill of sale (the "Bill of Sale") conveying the Purchased Assets, the form of which is attached hereto as Exhibit "B";

(b)     A duly executed Assignment of Intangibles/Equipment Leases (Assignment of Intangibles/Equipment Leases in the form attached hereto as Exhibit "C";

(c)     Any such additional documents, including any certificates of title or other documents, as shall be reasonably required to consummate the transaction contemplated by this Agreement; and

(d)     A Final Order approving the transactions contemplated herein.

3.4     Closing Obligations and Deliveries of Purchaser. At the Closing, Purchaser shall deliver, or cause to be delivered, to Seller:

(a)     The full amount of the Purchase Price pursuant to Section 1.4 hereof, as increased or decreased by prorations and adjustments as provided herein; and

(b)     A duly executed Assignment of Intangibles/Equipment Leases in the form attached hereto as Exhibit "C"; and

Re/Max PV-Re/Max Marquee
Purch Sale Agmt 2-9-10

(c)      Any such additional documents as shall be reasonably required to consummate the transaction contemplated by this Agreement.

3.5      <u>Closing Costs</u>.  Seller shall be responsible for the fees of any counsel representing it in connection with this transaction. Purchaser shall be responsible for: (a) the fees of any counsel representing Purchaser in connection with this transaction; (b) any escrow fees and closing costs; and (c) all reasonable costs associated with Purchaser's investigation of the Purchased Assets.  All other costs and expenses incident to this transaction and the Closing shall be shared equally.

3.6      <u>Conditions Precedent to Obligation of Purchaser</u>.  The obligations of Purchaser to consummate the transactions contemplated hereby are, unless waived by Purchaser, subject to the fulfillment, at or before the Closing, of each of the following conditions:

(a)      Each representation and warranty of Seller set forth in this Agreement shall be true and correct as of the date hereof and as of the Closing Date, as though made on and as of the Closing Date, except that, representations and warranties that by their terms speak only as of the date hereof or some other specific date need be true and correct only as of such date;

(b)      Seller shall have performed, satisfied and complied with all express covenants, agreements and conditions required by this Agreement to be performed or complied with by Seller on or before the Closing Date;

(c)      Receipt of requisite approval or consent, or court order free and clear of the interest of Comerica Bank, N.A. and any other lienholder with a security interest, lien or other encumbrance on any of the Purchased Assets;

(d)      Entry of a Sale Order by the Bankruptcy Court.

3.7      <u>Conditions Precedent to Obligation of Seller</u>.  The obligations of Seller to consummate the transactions contemplated hereby are, unless waived by Seller, subject to the fulfillment, at or before the Closing, of each of the following conditions:

(a)      Each representation and warranty of Purchaser set forth in this Agreement shall be true and correct as of the date hereof and as of the Closing Date as though made on and as of the Closing Date, except that, representations and warranties that by their terms speak only as of the date hereof or some other specific date need be true and correct only as of such date;

(b)      Purchaser shall have performed, satisfied and complied with all covenants, agreements and conditions required by this Agreement to be performed or complied with by Purchaser on or before the Closing Date;

(c)      Entry of the Sale Order from the Bankruptcy Court; and

(d)      Seller shall have received the Purchase Price payable at Closing in accordance with Section 1.4 hereof.

3.8      <u>Delivery of Purchased Assets</u>.  During regular business hours on the Closing Date, or reasonably soon thereafter (so long as such date is a regular business day), upon full performance of the obligations contained herein of each Party hereto and upon reasonable prior written notice to Seller, Purchaser shall take delivery of the Purchased Assets.

## Article 4 - REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser warrants and/or represents the following:

Re/Max PV-Re/Max Marquee
Purch Sale Agmt 2-9-10

4.1     Authorization.  This Agreement has been duly executed and delivered by Purchaser and other documents herein contemplated to be executed by Purchaser, will be duly executed and delivered. This Agreement, and the Bill of Sale and other documents, when executed and delivered to Purchaser, constitute the legal, valid and binding obligation of Purchaser, enforceable against Purchaser in accordance with its terms.

4.2     No Breach.    The execution and delivery by Purchaser of this Agreement, the performance by Purchaser of its obligations hereunder and the consummation by Purchaser of the transactions contemplated hereby will not, directly or indirectly, (i) constitute a default under, result in a violation or breach of, result in the cancellation or termination of, accelerate the performance required under, or result in the creation of any encumbrance upon any of the properties of Purchaser pursuant to, any contract to which Purchaser is a party or by which any of such properties is bound or (ii) result in a violation of, or conflict with, any legal requirement or order applicable to Purchaser or any of its properties.

4.3     Consents.  No consent, approval, exemption or authorization is required to be obtained from, no notice is required to be given to, and no filing is required to be made with, any third party by Purchaser in order (i) for this Agreement to constitute a legal, valid and binding obligation of Purchaser or (ii) to authorize or permit the consummation by Purchaser of the transactions contemplated hereby.

4.4     Full Disclosure.    To the best knowledge of Purchaser, none of the foregoing representations and warranties of Purchaser contains, or will contain as of the Closing, any untrue statement of material fact, or omits to state a material fact necessary to make such statement contained herein, in light of the circumstances in which it was made, not misleading.

4.5     No Broker.  Purchaser represents and warrants that it has not taken any action in connection with the negotiations relating to this Agreement and the transactions contemplated hereby which would give rise to any valid claims against Seller for a brokerage commission, finder's fee or other like payment.

## Article 5 - REPRESENTATIONS AND WARRANTIES OF SELLER

Seller warrants and/or represents the following:

5.1     Organization.  Seller is a California corporation duly organized, validly existing and in good standing under the laws of the State of California.  Seller has all of the corporation power and authority necessary to (i) execute, deliver and perform its obligations under this Agreement, and (ii) consummate the transactions contemplated hereby, subject to Bankruptcy Court approval.

5.2     Authorization.  Subject to any necessary approval by the Bankruptcy Court, the execution and delivery by Seller of this Agreement, the performance by Seller of its obligations hereunder and the consummation by Seller of the transactions contemplated hereby have been duly authorized by all necessary corporation action on the part of Seller.  This Agreement has been duly executed and delivered by Seller and the Bill of Sale, Assignment of Intangibles/Equipment Leases and other documents herein contemplated to be executed by Seller, will be duly executed and delivered.  This Agreement, and the Bill of Sale, Assignment of Intangibles/Equipment Leases and other documents, when executed and delivered by Seller, constitutes the legal, valid and binding obligation of Seller, enforceable against Seller in accordance with its terms, subject to Bankruptcy Court approval.

5.3     No Breach.  Subject to any necessary approval by the Bankruptcy Court, including an entry of the Sale Order, the execution and delivery by Seller of this Agreement, the performance by Seller of its obligations hereunder and the consummation by Seller of the transactions contemplated hereby will not, directly or indirectly, (i) conflict with, result in any violation of or constitute a default under any

Page 6 of 13

organizational documents of Seller, or (ii) result in a violation of, any order to which Seller, or any of the Purchased Assets may be subject, provided that the consent, or court order deeming consent, of Comerica Bank, N.A. is obtained to the sale of the Purchased Assets.

5.4    Consents.  Except as otherwise expressly set forth herein, specifically with regard to the Bankruptcy Court, RE/MAX International, Inc. and Comerica Bank, N.A., no consent, approval, exemption or authorization is required to be obtained from, no notice is required to be given to, and no filing is required to be made with, any third party by Seller in order (i) for this Agreement to constitute a legal, valid and binding obligation of Seller or (ii) to authorize or permit the consummation by Seller of the transactions contemplated hereby.

5.5    Title to Owned Properties.  Subject to any necessary approval by the Bankruptcy Court, Seller has, or will have prior to the Closing Date, good and marketable title to all of the Purchased Assets, or otherwise warrants to Purchaser that Seller will transfer to Purchaser the Purchased Assets free of any liens or encumbrances, except as expressly assumed by Purchaser in writing.  Title to said Purchased Assets shall be "free and clear" of any and all encumbrances (11 U.S.C. 363).

5.6    Full Disclosure.  To the best knowledge of Seller, none of the foregoing representations and warranties of Seller contains, or will contain as of the Closing any untrue statement of material fact, or omits to state a material fact necessary to make such statement contained herein, in light of the circumstances in which it was made, not misleading.

5.7    No Broker.  Seller represents and warrants that it has not taken any action in connection with the negotiations relating to this Agreement and the transactions contemplated hereby which would give rise to any valid claims against Purchaser for a brokerage commission, finder's fee or other like payment.

5.8    Environmental.  To the best knowledge of Seller, there are no toxic or hazardous materials which would cause any adverse environmental condition at the Premises, except cleaning supplies in normal quantities.

## Article 6 – PRE-CLOSING COVENANTS

6.1    Conduct By Purchaser.  From the date hereof until the Closing, Purchaser shall not take any action which would cause any representation or warranty contained in Article 4 hereof to be untrue or incorrect in any respect as of the Closing.

6.2    Conduct by Seller.  From the date hereof until the Closing, Seller shall not take any action which would cause any representation or warranty contained in Article 5 hereof to be untrue or incorrect in any respect as of the Closing.

6.3    Agreement.  Seller will not, without the prior written consent of Purchaser, enter into any agreement, contract, or commitment, which would constitute a burden or encumbrance on the Purchased Assets or have an adverse effect on any portion of the Premises. Notwithstanding the foregoing, Seller may enter into an agreement or seek an order of the Bankruptcy Court authorizing its use of cash collateral as prescribed by Bankruptcy Code § 363, which shall not be deemed a breach of this provision.

6.4    Business Operations.  Purchaser and Seller hereby agree that during the period beginning on the Effective Date and ending on the Closing Date operation of the business of the Company shall be conducted in a "business as usual" manner by Seller.

6.5    Fulfillment of Conditions.  Each Party shall use all reasonable efforts to fulfill or cause to be fulfilled the conditions set forth in Paragraphs 3.6 and 3.7.

6.6    Confidentiality.  The terms of this Agreement as well as any information received from Seller by Purchaser regarding the Company, Seller or Seller's shareholders during negotiation and/or due diligence investigations prior to this Agreement have been and shall remain confidential and shall not be divulged or disclosed to anyone, including but not limited to employees or patrons of the Company except to the other parties, their respective counsel, financial advisors and accountants, and only on the condition that said persons agree that they shall maintain the confidentiality of the parties and the terms of this Agreement.  Nothing contained herein shall prohibit any of the parties hereto from divulging the terms of this Agreement if compelled to do so by lawful subpoena or court order, or Seller from attaching a true and correct copy of this Agreement as an exhibit to the Sale Motion.

### Article 7 - TERMINATION

7.1    Termination.  Notwithstanding anything contained herein to the contrary, this Agreement may be terminated:

(a)    at the Closing or at any time prior thereto, only by mutual written consent of Seller and Purchaser, and in the event of said termination, Purchaser shall be remitted the full amount of the Deposit, including any interest accrued thereon;

(b)    at the Closing, by Purchaser, if any of the conditions set forth in Paragraph 3.6 hereof shall not have been fulfilled, and in the event of said qualifying termination, Purchaser shall be remitted the full amount of the Deposit, including any interest accrued thereon;

(c)    at the Closing, by Seller, if any of the conditions set forth in Paragraph 3.7 hereof shall not have been fulfilled and shall not have been waived by Seller at or prior to the Closing. In that case, the full amount of the Deposit and any accrued interest shall be forfeited to the Seller; and

(d)    in the event that Purchaser is not the successful purchaser of the Purchased Assets at a sale or through a plan of reorganization as conducted by the Bankruptcy Court.

7.2    Default by Purchaser.  IN THE EVENT THE SALE OF THE PURCHASED ASSETS AS CONTEMPLATED HEREUNDER IS NOT CONSUMMATED DUE TO ANY DEFAULT OF PURCHASER HEREUNDER, SELLER SHALL BE ENTITLED TO TERMINATE THIS AGREEMENT AND RECEIVE THE DEPOSIT AS LIQUIDATED DAMAGES FOR THE BREACH OF THIS AGREEMENT, IT BEING AGREED BETWEEN THE PARTIES HERETO THAT THE ACTUAL DAMAGES TO SELLER IN THE EVENT OF SUCH BREACH ARE IMPRACTICAL TO ASCERTAIN AND THE AMOUNT OF THE DEPOSIT IS A REASONABLE ESTIMATE THEREOF.

7.3    Default by Seller.  IN THE EVENT THE SALE OF THE PURCHASED ASSETS AS CONTEMPLATED HEREUNDER IS NOT CONSUMMATED DUE TO ANY DEFAULT OF SELLER, PURCHASER SHALL BE ENTITLED TO EITHER: (A) TERMINATE THIS AGREEMENT BY WRITTEN NOTICE TO SELLER, WHEREUPON PURCHASER SHALL FORTHWITH RECEIVE THE RETURN OF THE DEPOSIT, WHICH RETURN SHALL OPERATE TO RELEASE SELLER FROM ANY AND ALL LIABILITY HEREUNDER OR (B) FILE A CLAIM IN THE SELLERS BANKRUPTCY ESTATE FOR DAMAGES THEREFOR IN THE AMOUNT OF ACTUAL OUT-OF-POCKET EXPENSES INCURRED BY PURCHASER IN CONNECTION HEREWITH NOT TO EXCEED TWENTY FIVE THOUSAND DOLLARS ($25,000.00).

Seller's Initials                    Purchaser's Initials

### Article 8

Re/Max PV-Re/Max Marquee
Purch Sale Agmt 2-9-10

6.6   Confidentiality.  The terms of this Agreement as well as any information received from Seller by Purchaser regarding the Company, Seller or Seller's shareholders during negotiation and/or due diligence investigations prior to this Agreement have been and shall remain confidential and shall not be divulged or disclosed to anyone, including but not limited to employees or patrons of the Company except to the other parties, their respective counsel, financial advisors and accountants, and only on the condition that said persons agree that they shall maintain the confidentiality of the parties and the terms of this Agreement.  Nothing contained herein shall prohibit any of the parties hereto from divulging the terms of this Agreement if compelled to do so by lawful subpoena or court order, or Seller from attaching a true and correct copy of this Agreement as an exhibit to the Sale Motion.

## Article 7 - TERMINATION

7.1   Termination.  Notwithstanding anything contained herein to the contrary, this Agreement may be terminated:

(a)   at the Closing or at any time prior thereto, only by mutual written consent of Seller and Purchaser, and in the event of said termination, Purchaser shall be remitted the full amount of the Deposit, including any interest accrued thereon;

(b)   at the Closing, by Purchaser, if any of the conditions set forth in Paragraph 3.6 hereof shall not have been fulfilled, and in the event of said qualifying termination, Purchaser shall be remitted the full amount of the Deposit, including any interest accrued thereon;

(c)   at the Closing, by Seller, if any of the conditions set forth in Paragraph 3.7 hereof shall not have been fulfilled and shall not have been waived by Seller at or prior to the Closing. In that case, the full amount of the Deposit and any accrued interest shall be forfeited to the Seller; and

(d)   in the event that Purchaser is not the successful purchaser of the Purchased Assets at a sale or through a plan of reorganization as conducted by the Bankruptcy Court.

7.2   Default by Purchaser.  IN THE EVENT THE SALE OF THE PURCHASED ASSETS AS CONTEMPLATED HEREUNDER IS NOT CONSUMMATED DUE TO ANY DEFAULT OF PURCHASER HEREUNDER, SELLER SHALL BE ENTITLED TO TERMINATE THIS AGREEMENT AND RECEIVE THE DEPOSIT AS LIQUIDATED DAMAGES FOR THE BREACH OF THIS AGREEMENT, IT BEING AGREED BETWEEN THE PARTIES HERETO THAT THE ACTUAL DAMAGES TO SELLER IN THE EVENT OF SUCH BREACH ARE IMPRACTICAL TO ASCERTAIN AND THE AMOUNT OF THE DEPOSIT IS A REASONABLE ESTIMATE THEREOF.

7.3   Default by Seller.  IN THE EVENT THE SALE OF THE PURCHASED ASSETS AS CONTEMPLATED HEREUNDER IS NOT CONSUMMATED DUE TO ANY DEFAULT OF SELLER, PURCHASER SHALL BE ENTITLED TO EITHER: (A) TERMINATE THIS AGREEMENT BY WRITTEN NOTICE TO SELLER, WHEREUPON PURCHASER SHALL FORTHWITH RECEIVE THE RETURN OF THE DEPOSIT, WHICH RETURN SHALL OPERATE TO RELEASE SELLER FROM ANY AND ALL LIABILITY HEREUNDER OR (B) FILE A CLAIM IN THE SELLERS BANKRUPTCY ESTATE FOR DAMAGES THEREFOR IN THE AMOUNT OF ACTUAL OUT-OF-POCKET EXPENSES INCURRED BY PURCHASER IN CONNECTION HEREWITH NOT TO EXCEED TWENTY FIVE THOUSAND DOLLARS ($25,000.00).

_____                    _____
Seller's Initials                    Purchaser's Initials

## Article 8

Re/Max PV-Re/Max Marquee
Purch Sale Agmt 2-9-10

[INTENTIONALLY OMITTED]

## Article 9

[INTENTIONALLY OMITTED]

## Article 10 – DISCLAIMERS AND WAIVERS

10.1    AS-IS SALE; DISCLAIMERS.  PURCHASER ACKNOWLEDGES AND AGREES THAT UPON CLOSING SELLER SHALL SELL AND CONVEY TO PURCHASER AND PURCHASER SHALL ACCEPT THE PURCHASED ASSETS AS IS, EXCEPT TO THE EXTENT EXPRESSLY PROVIDED OTHERWISE IN THIS AGREEMENT.  PURCHASER REPRESENTS TO SELLER THAT PURCHASER HAS CONDUCTED SUCH INVESTIGATIONS OF THE PURCHASED ASSETS AS PURCHASER DEEMS NECESSARY OR DESIRABLE TO SATISFY ITSELF AS TO THE CONDITION THEREOF PRIOR TO ENTERING THIS AGREEMENT.  PURCHASER FURTHER ACKNOWLEDGES AND AGREES THAT, EXCEPT AS OTHERWISE EXPRESSLY SET FORTH HEREIN, THE SELLER MAKES NO REPRESENTATIONS OF ANY KIND, EXPRESS OR IMPLIED, WITH RESPECT TO THE PURCHASED ASSETS, INCLUDING, BUT NOT LIMITED TO, ANY REPRESENTATION OR WARRANTY WITH RESPECT TO THE FITNESS, DESIRABILITY, OR THE MERCHANTABILITY THEREOF, OR SUITABILITY FOR A PARTICULAR PURPOSE.

10.2    Survival of Disclaimers.  The provisions of this Article 10 shall survive the Closing or any termination of this Agreement.  The provisions of Section 6.6 shall survive any termination of this Agreement.

10.3    Independent Examination and Assumption of Risk. Purchaser acknowledges that it is relying exclusively upon its own independent investigations and examinations of all matters relating to the Property and its right to operate its business at the Premises and not upon any statement of Seller or any of its respective officers, directors, managers, employees, agents, accountants, financial advisors or attorneys not contained herein.

## Article 11 - GENERAL

11.1    Governing Law.  The validity, interpretation, performance and enforcement of this Agreement shall be governed by the laws of the State of California and the United States Bankruptcy Code without regard to the conflict of laws provisions thereof.  Each of the Parties consents to the exclusive jurisdiction of the Bankruptcy Court over any matter, action, or proceeding relating to this Agreement, including any proceeding brought in connection with this Agreement, and agrees that the Bankruptcy Court shall be the exclusive forum to hear, determine, and enter appropriate orders and judgments in all such matters, actions, or proceedings, provided, however, that in the event the Bankruptcy Court refuses to exercise jurisdiction over any proceeding related to or concerning this Agreement, each of the Parties consent to the jurisdiction of any state or federal court located in Los Angeles County, California that may properly exercise jurisdiction over any such proceeding. Each Party consents and submits to the non-exclusive personal jurisdiction of the Bankruptcy Court, or in California state or federal court, as applicable, with respect of any such proceeding.  Each Party consents to service of process upon it with respect to any such proceeding by registered mail, return receipt requested, and by any other means permitted by applicable laws and rules.  Each Party waives any objection that it may now or hereafter have to the laying of venue of any such proceeding in the Bankruptcy Court, or in California state or federal court, as applicable, and any claim that it may now or hereafter have that any such proceeding in the Bankruptcy Court, or in California state or federal court, as applicable, has been brought in an inconvenient forum.  Each Party irrevocably waives trial by jury in any such action, proceeding or counterclaim arising out of or relating to this Agreement or the transactions contemplated hereby.  Notwithstanding anything contained in this Section, all disputes involving matters arising in connection with this Agreement will be brought as contested matters and not adversary proceedings.

   11.2   <u>Binding Effect; Assignment; Third Party Beneficiaries</u>. Subject to any necessary approval
of the Bankruptcy Court, this Agreement shall be binding upon the Parties and their respective
successors and assigns and shall inure to the benefit of the Parties, their shareholders, and their
respective successors and permitted assigns. Neither Seller nor Purchaser shall assign any of its rights
or delegate any of its duties under this Agreement (by operation of law or otherwise) without the prior
written consent of the other of them, except that the rights and interests of Seller may be assigned to a
trustee under Chapter 11 of the Bankruptcy Code and the rights and interests of Purchaser may be
assigned to an entity newly formed solely to take ownership of the Purchased Assets and continue
operating Seller's business. Any assignment of rights or delegation of duties under this Agreement by a
Party without the prior written consent of the other Parties, if such consent is required hereby, shall be
void. No person shall be, or be deemed to be, a third party beneficiary of this Agreement.

   11.3   <u>Entire Agreement</u>. This Agreement together with any Exhibits attached hereto constitute
the entire contract among the Parties with respect to the subject matter hereof and cancel and supersede
all of the previous or contemporaneous contracts, representations, warranties and understandings
(whether oral or written) by, between or among the Parties with respect to the subject matter hereof.
Nothing contained in any document or instrument of conveyance, transfer, assignment or delivery
executed or delivered at the Closing pursuant to this Agreement shall amend, extend, modify, renew or
alter in any manner any representation, warranty, covenant, agreement or indemnity contained herein.

   11.4   <u>Notices</u>.   All notices, requests, demands, and other communications under this
Agreement shall be in writing by (a) personal delivery, (b) reputable overnight delivery service with proof
of delivery, (c) United States Mail, postage prepaid, registered or certified mail, return receipt requested,
or (d) legible facsimile transmission, sent to the intended addressee at the address set forth below, or to
such other address or to the attention of such other person as the addressee shall have designated by
written notice sent in accordance herewith, and shall be deemed to have been given upon receipt or
refusal to accept delivery, or, in the case of facsimile transmission, as of the date of the facsimile
transmission provided that an original of such facsimile is also sent to the intended addressee by means
described in clauses (a), (b) or (c) above. Unless changed in accordance with the preceding sentence,
the addresses for notices given pursuant to this Agreement shall be as follows

   If to Seller:                     RE/MAX Marquee Partners, Inc.
                                     Attn: Kelli Todd
                                     23611 Susana Ave
                                     Torrance, CA 90505
                                     Email: ktodd@realestatelosangeles.com
                                     Phone: 310.490-0439

   With a copy to:                   Creim Macias Koenig & Frey LLP
                                     Sandford L. Frey
                                     Stuart I. Koenig
                                     633 W 5th St, 51st Floor
                                     Los Angeles, CA 90071
                                     Email: SKoenig@CMKLLP.com
                                            SFREY@CMKLLP.COM
                                     Phone: (213) 614-1944
                                     Fax: (213) 614-1961

   If to Purchaser:                  Surfside Ventures, Inc.
                                     Attn:  Sandra Sanders, President
                                     63 Malaga Cove Plaza

Page 10 of 13

Palos Verdes Estates, CA 90274
Email: ssanders@remaxpve.com
Phone: 310.378.9494
Fax: 310.373.3427

With a copy to:    Spierer, Woodward, Corbalis & Goldberg, P.C.
Attn: John A. Woodward
707 Torrance Blvd, Suite 200
Redondo Beach, CA 90277
Fax: (310) 316-1823

11.5    <u>Further Assurances</u>. At any time and from time to time after the Closing, the Parties shall execute, deliver and acknowledge such other documents and further assurances, and take such further actions and without further consideration as may be reasonably required in order to consummate the transactions contemplated hereby and the correction of errors and defects in any such documents.

11.6    <u>Amendments</u>. No addition to, and no cancellation, renewal, extension, modification or amendment of, this Agreement shall be binding upon a Party unless such addition, cancellation, renewal, extension, modification or amendment is set forth in a written instrument which states that it adds to, amends, cancels, renews, extends or modifies this Agreement and which is executed and delivered on behalf of each Party by an officer of, or attorney-in-fact for, such Party.

11.7    <u>Waivers</u>. No waiver of any provision of this Agreement shall be binding upon a Party unless such waiver is expressly set forth in a written instrument which is executed and delivered on behalf of such Party by an officer of, or attorney-in-fact for, such Party. Such waiver shall be effective only to the extent specifically set forth in such written instrument. Neither the exercise (from time to time and at any time) by a Party of, nor the delay or failure (at any time or for any period of time) to exercise, any right, power or remedy shall constitute a waiver of the right to exercise, or impair, limit or restrict the exercise of, such right, power or remedy or any other right, power or remedy at any time and from time to time thereafter. No waiver of any right, power or remedy of a Party shall be deemed to be a waiver of any other right, power or remedy of such Party or shall, except to the extent so waived, impair, limit or restrict the exercise of such right, power or remedy.

11.8    <u>Remedies</u>. The rights, powers and remedies of the Parties set forth herein for a breach of or default under this Agreement (including, without limitation, a breach of or default under any of the representations, warranties, covenants or agreements contained in this Agreement) are cumulative and in addition to, and not in lieu of, any rights or remedies that any Party may otherwise have under this Agreement, at law or in equity.

11.9    <u>Headings</u>. The headings set forth in this Agreement have been inserted for convenience of reference only, shall not be considered a part of this Agreement and shall not limit, modify or affect in any way the meaning or interpretation of this Agreement.

11.10    <u>Severability</u>. If any covenant or provision of this Agreement shall hereafter be held to be invalid, unenforceable or illegal, in whole or in part in any jurisdiction, such covenant or provision shall, as to such jurisdiction, be ineffective to the extent of such prohibition without invalidating the remaining covenants and provisions hereof and shall, as to such jurisdiction, be deemed to be severed from this Agreement to the extent of such prohibition.    Such holding shall not affect or impair the validity, enforceability or legality of such provision in any other jurisdiction or under any other circumstances.

11.11    <u>Attorneys Fees</u>.    In the event of any legal action to enforce the provisions of this Agreement, the prevailing party in such action shall be entitled to recover its reasonable attorneys' fees, and other costs and expenses incurred in such action, including its attorneys' fees and experts' fees and

Re/Max PV-Re/Max Marquee
Purch Sale Agmt 2-9-10

IN WITNESS WHEREOF, the Parties have duly executed and delivered this Agreement as of the date first above written.

| PURCHASER: | SELLER: |
|---|---|
| SURFSIDE VENTURES, INC.<br>a California corporation | RE/MAX MARQUEE PARTNERS, INC.<br>a California corporation |
| By: _____<br>    Sandra Sanders, President | By: _____<br>    Kelli Todd, CEO |
| By: _____<br>    James Sanders, Vice-President | By: _____<br>Name: _____<br>Title: _____ |

ACKNOWLEDGEMENT OF ESCROW AGENT AND AGREEMENT TO BE BOUND BY THE CONFIDENTIALITY TERMS AS SET IN 6.6:

By: _____

Name: _Victoria Kraft_

Title: _Manager - Escrow Officer_

Re/Max PV-Re/Max Marquee
Purch Sale Agmt 2-9-10

IN WITNESS WHEREOF, the Parties have duly executed and delivered this Agreement as of the date first above written.

| PURCHASER: | SELLER: |
|---|---|
| SURFSIDE VENTURES, INC.<br>a California corporation | RE/MAX MARQUEE PARTNERS, INC.<br>a California corporation |
| By: *Sandra Sanders*<br>Sandra Sanders, President | By: _____<br>Kelli Todd, CEO |
| By: *James Sanders*<br>James Sanders, Vice-President | By: _____<br>Name: _____<br>Title: _____ |

ACKNOWLEDGEMENT OF ESCROW AGENT AND AGREEMENT TO BE BOUND BY THE CONFIDENTIALITY TERMS AS SET IN 6.6:

By: *Victoria Kraft*

Name: *Victoria Kraft*

Title: *Manager Escrow Officer*

Re/Max PV-Re/Max Marquee
Purch Sale Agmt 2-9-10

costs in such action or proceeding. The prevailing party shall be determined by the court based upon an assessment of which party's major arguments made or positions taken in the proceedings could fairly be said to have prevailed on major disputed issues in the court's decision. If the party which shall have commenced or instituted the action, suit or proceeding shall dismiss or discontinue it without the concurrence of such other party, then such other party shall be deemed the prevailing party.

11.12    Counterparts. This Agreement may be signed in any number of counterparts (and by facsimile transmission), each of which when so executed and transmitted or delivered shall constitute an original instrument, but all of which together shall constitute one and the same instrument. This Agreement shall become effective and be deemed to have been executed and delivered by all of the Parties at such time as counterparts shall have been executed and delivered by each of the Parties, regardless of whether each of the Parties has executed the same counterpart. This Agreement shall be a valid and binding agreement only when executed and delivered to the Parties hereto (although the Seller's duties and obligations shall be subject to Bankruptcy Court approval).

11.13    Computation of Time. All references to a period of "days" shall mean calendar days unless otherwise specifically set forth herein. A business day shall mean Monday through Friday of each week, excluding holidays observed by the U.S. federal government. If the last day for any period or any date pursuant to this Agreement is not a business day, such last day or date shall automatically be deemed to be the next succeeding business day.

11.14    Email Address-Kelli Todd. Purchaser hereby covenants and agrees that the email address of Kelli Todd (as listed in Paragraph 11.4 above) shall remain fully active and accessible for a period of at least one (1) year from the Closing Date.

11.15    Public Announcements. Except as required by this Agreement or the Bankruptcy Court, Purchaser shall not issue any press release or public announcement concerning this Agreement or the transactions contemplated hereby without obtaining the prior written approval of the Seller, which approval shall not be unreasonably withheld, conditioned or delayed.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

Re/Max PV-Re/Max Marquee
Purch Sale Agmt 2-9-10

EXHIBIT "A"

PURCHASED ASSETS

### Furniture Fixtures and Equipment

- Office Supplies existing on the Premises as of the Closing Date
- All Premises signage, to the extent owned by Seller
- Inventory Lists attached to the Bill of Sale Schedule 1 (said list being incorporated herein by this reference)

### Equipment Leases

Copy Machines:

| OFFICE | MODEL | SERIAL # | BRAND | DEPARTMENT | I.D. # | LEASE INFO |
|--------|-------|----------|-------|------------|--------|------------|
| SM | 500 | 50GE07660 | KONICA | MAIN COPIER | 50329 IMAGE IV | TYGRIS EXP 8/17/10 $341.32 |
| VENICE | 420 | 42GE08230 | KONICA | MAIN COPIER | 50268 IMAGE IV | TYGRIS EXP 7/13/10 $306.20 |

### Intellectual Property

**Goodwill:**
All Company Goodwill associated with the on-going business conducted at the Premises.

**Telephone Numbers:**

**BRANCH OFFICE – MARINA DEL REY/VENICE**

| PILOT #:<br>577-5300 | COMPUTER MODEMS:<br>577-5313 SUPRA KEY BOX | FAX LINES:<br>577-5301 INCOMING<br>577-5312 OUTGOING<br>577-5316 OUTGOING (3RD FLOOR) |
|---|---|---|
| ROTARY LINES:<br>577-5306<br>577-5307<br>577-5308<br>577-5309<br>577-5310<br>577-5311<br>577-5318<br>577-5319<br>821-4365<br>821-3767 | BACKLINE VM ROTARY GROUP:<br>577-5302<br>577-5303<br>577-5304 | |

**BRANCH OFFICE – SANTA MONICA**

| PILOT NUMBER:<br>310-264-2225 | FAX MACHINES:<br>310-264-2200 - INCOMING | BACKLINE VM:<br>310-264-2210 |
|---|---|---|
| DID BLOCK:<br>310-566-4200 TO 310-566-4316 | | |

**Fictitious Business Names/Tradenames:**

RE/MAX Westside
Properties

### Accounts Receivable (if any)

### Miscellaneous Premises-Specific Company Interests

- All fees owing to Company as Broker/Owner by any agents operating from the Premises for any real estate transactions closing after the Closing Date. Seller hereby acknowledges and agrees that the Purchase Price is good and sufficient consideration for the assignment contemplated by the foregoing sentence.
- All of Company's Premises-specific interest in any fees due the Company as broker/agent in any contracts, which are in negotiation on behalf of any Company client and which have not closed escrow on or before the Closing Date.
- Any and all funds held in trust for clients of the Company (to the extent remaining at Closing in Company's client trust account) pertaining to real estate transactions initiated by associates located at the Premises.

EXHIBIT "B"

FORM OF BILL OF SALE

## BILL OF SALE

FOR VALUABLE CONSIDERATION, the receipt and sufficiency of which are hereby acknowledged, RE/MAX Marquee Partners, Inc., a California corporation ("Seller") does hereby sell, assign and convey to Surfside Ventures, Inc., a California corporation ("Purchaser") any and all of Seller's right, title and interest in and to all tangible personal property described in Schedule 1 attached hereto (the "Tangible Purchased Assets").

TO HAVE AND TO HOLD all of the Tangible Purchased Assets unto Purchaser, its successors and assigns, to its own use forever.

IN WITNESS WHEREOF, Seller has executed this Bill of Sale as of _____ _____, 2010.

**SELLER:**
RE/MAX MARQUEE PARTNERS, INC.,
a California corporation

_____
Kelli Todd, CEO


By: _____
Name: _____
Title: _____

SCHEDULE 1

TANGIBLE PURCHASED ASSETS

**Furniture Fixtures and Equipment**

- Office Supplies existing on the Premises as of the Closing Date
- All Premises signage, to the extent owned by Seller
- All Furniture Fixtures and Equipment located on or at the Premises listed on the attached Inventory Lists (the contents of said lists incorporated herein by this reference)

## Inventory Lists

Marina del Rey/Venice - Office Inventory
January 2010

| ITEM | SIZE OR COLOR | QUANTITY | LOCATION | COMMENTS |
|---|---|---|---|---|
| DESKS WITH NO RETURNS | wood | 12 | | |
| DESKS WITH RETURNS | wood | 1 | escrow office | |
| DESKS WITH RETURNS | wood/black | 2 | T. Yollin's office | |
| MODULAR FURNITURE | with returns | 10 | | |
| MODULAR FURNITURE | without returns | 12 | | |
| TASK CHAIRS w/ ARMS | | 10 | 1st floor | |
| | | 9 | 2nd floor | |
| | | 12 | 3rd floor | |
| TASK CHAIRS w/ OUT ARMS | | 2 | 1st floor | |
| | | | | |
| PLASTIC CHAIR MATS | | 10 | 1st floor | |
| | | 6 | 2nd floor | |
| | | 10 | 3rd floor | |
| | | | | |
| TRASH CANS | Small Black | 27 | | |
| | Small Blue (Recycle) | 1 | | |
| | Tall Gray | 2 | | |
| | | | | |
| CONFERENCE RM TABLES | | 1 | 1st floor | |
| CONFERENCE RM CHAIRS | | 6 | 1st floor | |
| | | | | |
| TELEPHONE INSTRUMENTS | Panasonic | 35 | | |
| | Master Phone | 1 | 1st floor | |
| | | | | |
| CORK BOARDS | 1 | 1 | 1ST | |
| | | | | |
| WHITE SALES BOARDS | | 1 | 1st floor | |

Exhibit B

Marina del Rey/Venice - Office Inventory
January 2010

| ITEM | SIZE OR COLOR | QUANTITY | LOCATION | COMMENTS |
|---|---|---|---|---|
| FILE CABINETS | | 1 | 1st floor | |
| | | 2 | basement | |
| | | | | |
| TELEVISION PLASMA | | 2 | computer area and conf room | |
| | | | | |
| VCR/DVD | | 2 | | |
| | | | | |
| ARTWORK | small | 4 | | |
| | large | 3 | | |
| | medium | 1 | | |
| | small | 3 | stairwell | |
| | | | | |
| POTS FOR PLANTS | large | 4 | 1st & 3rd floor | |
| | small | 2 | 1st & basement | |
| | long blk | 8 | 1st & 2nd floor | |
| | | | | |
| FAX MACHINES | Muratec 320 | 3 | 1st (2) & 3rd floor | |
| | | | | |
| PANASONIC PHONE SYSTEM | | 1 | | |
| TAP IT CALL ACCTG SYSTEM | | 1 | | |
| AMANDA VM SYSTEM | | 1 | | |
| COMPUTER HARD DRIVES | | 4 | agent work area, phone room and front desk | |
| COMPUTER KEYBOARDS | | 4 | agent work area, phone room and front desk | |
| WIRELESS KEYBOARD | Plasma (plus mouse) | 1 | agent work area | |
| COMPUTER MONITORS | | 4 | agent work area, phone room and front desk | |

Exhibit B

Marina del Rey/Venice - Office Inventory
January 2010

| ITEM | SIZE OR COLOR | QUANTITY | LOCATION | COMMENTS |
|---|---|---|---|---|
| COMPUTER MOUSE | | 4 | agent work area, phone room and front desk | |
| PRINTERS | HP4250dtn | 1 | 1st floor | b/w |
| | HP4700dn | 1 | 1st floor | color |
| | | | | |
| SCANNER | | 1 | | |
| | | | | |
| FIRE EXTINGUISHERS | | 3 | 1st, 2nd & 3rd floors | |
| | | | | |
| MICROWAVE OVEN | | 1 | | |
| REFRIGERATOR | small | 1 | | |
| | | | | |
| LOBBY TABLE (chairs) | glass coffee tables | 3 | | |
| | round | 1 | | |
| LOBBY WOODEN CHAIRS | guest chairs | 7 | | |
| LOBBY CHAIRS/SOFA | black leather sofa | 1 | | |
| | black leather loveseat | 1 | | |
| | black leather chairs | 2 | | |
| LOBBY RUGS | | 1 | | |
| DIGITAL CAMERA | Sony Cyber-shot 1.3 mega pixels | 1 | | |
| TYPEWRITERS | | 1 | | |
| PAPER SHREDDER | | 1 | | broken |
| BINDING MACHINE | | 1 | | |
| MISC | | | | |
| STEP STOOL | | 1 | | |
| COFFEE CARAFE | | 2 | | |
| DISH NETWORK | | 1 | conf room | |

Marina del Rey/Venice - Office Inventory
January 2010

| ITEM | SIZE OR COLOR | QUANTITY | LOCATION | COMMENTS |
|---|---|---|---|---|
| LOGITECH SPEAKER | | 1 | | |
| PATIO FURNITURE-OUTSIDE | metal table | 2 | | |
| | metal chairs | 8 | 3rd floor | |
| | metal/wood table | 1 | outside front door | |
| | chairs metal/wood | 2 | outside front door | |
| Basement | Vacuum, broken round table & X-mas tree | | | |

Exhibit B

Santa Monica - Office Inventory
January 2010

| ITEM | SIZE OR COLOR | QUANTITY | LOCATION | COMMENTS |
|---|---|---|---|---|
| CUBICLE DESKS | | 16 | | |
| TASK CHAIRS w/ ARMS | | 33 | | |
| | | | | |
| PLASTIC CHAIR MATS | | 37 | | |
| | | | | |
| TRASH CANS | Small Black | 38 | | |
| | Small Blue (Recycle) | 1 | | |
| | Tan Gray | 1 | | |
| | | | | |
| LEATHER CHAIRS | | 1 | | Lynn Tannenbaum's office |
| | | | | |
| CORK BOARDS | | 3 | | - 2 med. - 1 large |
| | | | | |
| TELEVISION PLASMA | | 2 | conf room | |
| | | | | |
| VCR/DVD | DVD | 2 | conf room | |
| | | | | |
| ARTWORK | | 15 | | |
| | | | | |
| FAX MACHINES | Muratec 520 | 1 | Front Desk | |
| | | | | |
| PRINTERS | HP4250n | 1 | Computer Area | b/w |
| | HP4700dn | 1 | Computer Area | color |
| | HP1018 | 1 | Front Desk | b/w |
| | | | | |
| SCANNER | | 1 | | |
| | | | | |
| FIRE EXTINGUISHERS | | 2 | | |

Santa Monica - Office Inventory
January 2010

| ITEM | SIZE OR COLOR | QUANTITY | LOCATION | COMMENTS |
|---|---|---|---|---|
| MICROWAVE OVEN | Black/Silver | 1 | | leased |
| REFRIGERATOR | Black/Silver | 1 | | leased |
| | | | | |
| DIGITAL CAMERA | | 1 | | |
| PAPER SHREDDER | Black | 1 | | |
| PAPER CUTTER | Beige | 1 | | |
| | | | MISC | |
| HEAVY DUTY STAPLER | Grey | 1 | | |
| ELECTRIC PENCIL SHARNER | Black | 1 | | |
| STEP STOOL | Black | 1 | | |
| LOGITECH SPEAKER | | 2 | conf room | Labtec Desk Speakers |

Exhibit B

**Exhibit C**

## FORM OF ASSIGNMENT OF INTANGIBLES/EQUIPMENT LEASES

### ASSIGNMENT AND ASSUMPTION OF INTANGIBLES/EQUIPMENT LEASES

THIS ASSIGNMENT AND ASSUMPTION OF INTANGIBLES/EQUIPMENT LEASES (this "**Assignment**") is made as of _____, 2010 by and between RE/MAX Marquee Partners, Inc., a California corporation ("**Assignor**"), and Surfside Ventures, Inc., a California corporation ("**Assignee**").

Pursuant to that certain Asset Purchase Agreement between Assignor and Assignee dated as of February 9, 2010, (the **"Asset Purchase Agreement"**), Assignor hereby assigns, transfers, sets over and conveys to Assignee any and all of Assignor's right, title and interest, to the extent the same may be lawfully assigned to Assignee, in, to and under all of: (1) the intangible personal property described in Schedule 1 attached hereto (the **"Intangibles"**) and (2) each of those certain equipment leases described in Schedule 2 attached hereto (the **"Equipment Leases"**), together with any security deposit tendered under any of the Equipment Leases.

Assignee does hereby assume and agree to perform all of Assignor's obligations under the Intangibles and the Equipment Leases accruing from and after the date hereof.  Assignee agrees to indemnify, protect, defend and hold Assignor harmless from and against any and all liabilities, losses, costs, damages and expenses (including reasonable attorneys' fees) directly or indirectly arising out of or related to any breach or default in Assignee's obligations hereunder.  Assignor shall remain liable for all of Assignor's obligations under the Intangibles accruing during the period in which Assignor owned the Property (as defined in the Asset Purchase Agreement).

This Assignment shall be binding upon and inure to the benefit of Assignor and Assignee and their respective heirs, executors, administrators, successors and assigns.

This Assignment may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

IN WITNESS WHEREOF, Assignor and Assignee have each executed this Assignment as of the date first written above.

| ASSIGNEE: | ASSIGNOR: |
|---|---|
| SURFSIDE VENTURES, INC.<br>a California corporation | RE/MAX MARQUEE PARTNERS, INC.<br>a California corporation |
| By: _____<br>     Sandra Sanders, President | By: _____<br>     Kelli Todd, CEO |
| By: _____<br>     James Sanders, Vice-President | By: _____<br>Name: _____<br>Title: _____ |

Exhibit C

SCHEDULE 1

INTANGIBLES

**Intellectual Property**

- **Goodwill:**
  - All Company Goodwill associated with the on-going business conducted at the Premises.

- **Fictitious Business Names/Tradenames:**

  RE/MAX Westside
  Properties

- **Telephone Numbers:**

<u>BRANCH OFFICE – MARINA DEL REY/VENICE</u>

| PILOT #:<br>577-5300 | COMPUTER MODEMS:<br>577-5313 SUPRA KEY BOX | FAX LINES:<br>577-5301 INCOMING<br>577-5312 OUTGOING<br>577-5316 OUTGOING (3RD FLOOR) |
|---|---|---|
| ROTARY LINES:<br>577-5306<br>577-5307<br>577-5308<br>577-5309<br>577-5310<br>577-5311<br>577-5318<br>577-5319<br>821-4365<br>821-3767 | BACKLINE VM ROTARY GROUP:<br>577-5302<br>577-5303<br>577-5304 | |

<u>BRANCH OFFICE – SANTA MONICA</u>

| PILOT NUMBER:<br>310-264-2225 | FAX MACHINES:<br>310-264-2200 - INCOMING | BACKLINE VM:<br>310-264-2210 |
|---|---|---|
| DID BLOCK:<br>310-566-4200 TO 310-566-4316 | | |

- **Accounts Receivable (if any):**

- **Miscellaneous Premises-Specific Company Interests**

  - All fees owing to Company as Broker/Owner by any agents operating from the Premises for any real estate transactions closing after the Closing Date. Seller hereby acknowledges and agrees that the Purchase Price is good and sufficient consideration for the assignment contemplated by the foregoing sentence.
  - All of Company's Premises-specific interest in any fees due the Company as broker/agent in any contracts, which are in negotiation on behalf of any Company client and which have not closed escrow on or before the Closing Date.
  - Any and all funds held in trust for clients of the Company (to the extent remaining at Closing in Company's client trust account) pertaining to real estate transactions initiated by associates located at the Premises.

Exhibit C

Schedule 2

EQUIPMENT LEASE DESCRIPTIONS

**Equipment Leases:**

**Copy Machines:**

| OFFICE | MODEL | SERIAL # | BRAND | DEPARTMENT | I.D. # | LEASE INFO |
|--------|-------|----------|-------|------------|--------|------------|
| SM | 500 | 50GE07660 | KONICA | MAIN COPIER | 50329 IMAGE IV | TYGRIS EXP 8/17/10 $341.32 |
| VENICE | 420 | 42GE08230 | KONICA | MAIN COPIER | 50268 IMAGE IV | TYGRIS EXP 7/13/10 $306.20 |

Exhibit C